IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RODGER A. JESSEE,                    §
                                     §
        Plaintiff,                   §
                                     §
V.                                   §        CIVIL ACTION NO. H-04-4278
                                     §
JOANNE B. BARNHART                   §
COMMISSIONER OF THE SOCIAL           §
SECURITY ADMINISTRATION,             §
                                     §
        Defendant.                   §

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment

(Document No. 13), Plaintiff's Motion for Summary Judgment (Document No. 16), and Defendant's

Reply thereto (Document No. 19).  Having considered the cross motions for summary judgment, the

administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below,

that Defendant's Motion for Summary Judgment (Document No.  13) is DENIED, that Plaintiff's

Motion for Summary Judgment (Document No. 16) is GRANTED, and that the decision of the

Commissioner is REMANDED for further proceedings.

---

[1] On February 17, 2005, pursuant to the parties' consent, the case was transferred by the
District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No.
12.

## I.  Introduction

Plaintiff Rodger A. Jessee ("Jessee") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Jessee argues that substantial evidence does not support the ALJ's decision, and that the ALJ, Philip R. Kline, committed errors of law when he found that Jessee retained the residual functional capacity ("RFC") for sedentary work, that Jessee could perform his past relevant work as an inside salesperson, and that he was therefore, not disabled.   Jessee contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision.  According to Jessee, the ALJ  erred by failing to articulate a legitimate basis for discounting his impairments of status post cervical fusion and headaches at steps three and four, and by finding him capable of performing his past relevant work given that he lost his previous job due to excessive absenteeism caused by pain in his neck, arm and headaches.  Jessee  moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding his claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Jessee was not disabled as a result of his impairments, the decision comports with applicable law, and that it should therefore be affirmed.

## II.  Administrative Proceedings

Jessee applied for DIB and SSI benefits on July 17, 2002, claiming that he has been unable

to work since June 18, 2002, due to a fusion of the cervical spine and headaches.  (Tr. 64-66, 204-206).  The Social Security Administration denied his applications at the initial and reconsideration stages. (Tr. 29A-43, 207-18).  After that, Jessee requested a hearing before an ALJ. (Tr. 44-45).  The Social Security Administration granted his request (Tr. 46-48) and the ALJ held a hearing on March 10, 2004, at which Jessee's claims were considered *de novo*.  (Tr. 227-274).  On April 7, 2004, the ALJ issued his decision finding Jessee  not disabled.  (Tr. 5-18).  The ALJ found that Jessee had not engaged in substantial gainful activity since the alleged onset of disability.  At steps two and three, he found that Jessee had status post cervical fusion and headaches, which are severe impairments within the meaning of the Act, but that these impairments did not meet or equal the requirements of a listed impairment.  Based on the medical records, the testimony of Jessee, the testimony of a medical expert who specializes in neurology, Woodrow Janese, M.D., and of a vocational expert, Emma Vasquez, the ALJ concluded that Jessee's complaints were not totally credible, that he had the residual functional capacity ("RFC") to perform sedentary work,[2] and that he could perform his past relevant work as an inside salesperson.  Based on those findings, the ALJ determined that Jessee was not disabled within the meaning of the Social Security Act.

Jessee then asked for a review by the Appeals Council of the ALJ's adverse decision.  (Tr. 3A-4, 219-26).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ

---

[2]"Residual  functional  capacity  is  defined  as  the  most  you  can  still  do  despite  your limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a).  According to the ALJ, Jessee could perform sedentary range of work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. §§ 404.970, 416.1470.  After considering Jessee's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on August 16, 2004, that there was no basis upon which to grant Jessee's request for review.  (Tr. 3A-3C). The ALJ's findings and decision thus became final.  Jessee has timely filed his appeal of the ALJ's decision.  42 U.S.C. § 405(g).  Both Jessee and the Commissioner have filed Motions for Summary Judgment (Document Nos. 13 & 15). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 274 (Document No. 8).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d

4

1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in

any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of
> impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in
> Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not
> disabled" must be made; and
>
> 5.  If  the claimant's impairment prevents him from doing any other substantial
> gainful activity, taking into consideration his age, education, past work experience,
> and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v.*

*Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of

proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.

6

*McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found that Jessee, despite his impairments and limitations, could perform sedentary work, could perform his past relevant work, and that he therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Jessee injured his back and neck on October 25, 1985, when he lifted an air handling unit.  (Tr. 153).  In January 1986, Jessee underwent surgery for disc excision and fusion of C5-C6.  (Tr. 153).  On March 23, 1987, N.A. Tadros, M.D., examined Jessee in connection with his request for a disability pension.  Dr. Tadros wrote:

> [Jessee] has limited flexion of the neck about 60%; has markedly limited and painful extension of the neck with right and left neck rotation bilaterally.  Sensations in the upper extremities were normal; the left biceps reflex was less brisk when compared

7

to the right; other reflexes were essentially normal.  [Jessee] had some indication of diminished muscle strength of the left upper extremity.

In essence, Mr. Jessee continues to be symptomatic and has limited and painful neck movements despite the fact that about 15 months have elapsed since his surgery, which indicates that he has reached the maximum improvement in that length of time, and because of the above mentioned limitations and symptoms, it is my opinion that he cannot perform most of the duties mentioned in his job description, including lifting and handling heavy materials and working overhead, looking up and down repeatedly, and fabricating and installing metal products.  He also is required to look up and use his arms overhead.  It is also my opinion that he will not be able to perform these duties in the future.  (Tr. 153-154).

In March 1994, Greg Hanson, M.D., reported that Jessee had a "flare-up of neck pain after doing some overhead carpentry work." (Tr. 177).  According to progress note, Jessee had "marked rigidity of the cervical spine."  Conversely, Jessee had no neurological findings.  Also, x-rays revealed a solid C5-C7 fusion with no significant degenerative changes.  Jessee was prescribed an anti-inflammatory medication and a brace mobilizer. (Tr. 200).

Jessee was next seen by Dr. Hansen on August 1, 1995.  Again, Jessee reported that he had "a lot of lower back pain."  Dr. Hansen's treatment note shows that Jessee had "a lot of rigidity on the lumbar spine."  Also, Jessee had negative straight leg raising and was neurologically intact.  (Tr. 177).  "X-rays revealed an elongated pars and L5-S1 bilaterally with degenerative change."  (Tr. 199). At Jessee's three week follow-up appointment on August 16, 1995, Dr. Hansen wrote: "Rodger is complaining of neck pain, arm pain, back pain and leg pain.  He states that he is uninsured and cannot pursue diagnostic studies and wants to continue conservative measures involving medication."  (Tr. 199).

X-rays taken in October 1995 show Jessee had "spondylolysis without spondylolisthesis at L5." (Tr. 160).  In December 1995, Jessee was treated at Ben Taub Hospital.  An MRI of Jessee's

cervical spine revealed:

> 1. Status post cervical spine fusion at C5-C7.
> 2. Small posterior osteophyte and disc bulge at the C4/C5 level, which is not felt to impinge the corresponding nerve roots.  (Tr. 155)

Jessee was seen by Dr. Hansen on July 3, 2001. (Tr. 198).  Because Jessee complained of increased neck and left radicular arm pain, Dr. Hansen referred him for an MRI.  The MRI indicated mild disc degeneration with mild disc bulging at C4-C5 and moderate disc degeneration with "2-mm broad-based disc bulge" at C7-T1.  (Tr. 196, 199).  Based on the results of the MRI, Dr. Hansen recommended that Jessee  undergo epidural steroid injections.  Jessee underwent the epidural injections on August 3, 2001 (Tr. 194), August 17, 2001 (Tr. 193), and September 7, 2001 (Tr. 192).  Because Jessee reported no improvement in pain following the epidural injections, Dr. Hansen recommended that he undergo a provocative discography at C4-5 and C7-T1.  (Tr. 190-191). The results of the procedure revealed:

> 1. At C-4-5, there is nuclear opacification.  There is annular degeneration and tearing with more prominent annular tearing seen posterocentrally with anterocentrally.  There is moderate central canal stenosis with an AP diameter of 11 mm.  There is a marked bony left foraminal and a moderate to marked right foraminal stenosis.
>
> 2. Solid interbody fusion at L5-6 and C6-7.
>
> 3. At C7-T1, there is nuclear opacification.  There is marked disc degeneration with diffuse annular degeneration and tearing.  There is a moderate central canal stenosis with an AP diameter of 11 mm.  There is marked bilateral bony foraminal stenosis. (Tr. 190-191).

 Dr. Hansen discussed the results of the provocative discography at Jessee's October 10, 2001, office visit.  With respect to surgery, Dr. Hansen wrote:  "I have explained to him that his neck is going to be considerably stiffer following the procedure.  (Tr. 184).  Jessee elected to undergo surgery.  An anterior cervical diskectomy and fusion was performed by Dr. Hanson and James E. Rose, M.D., on

November 29, 2001. (Tr. 162-163, 187). Dr. Rose reported that they "were able to clearly decompress the nerve roots, as well as the spinal cord bilaterally and at both levels at C4-5, at well as C7-T1." (Tr. 163). Although a progress note dated January 2002 indicated "good progression of the fusion" (Tr. 187), Jessee continued to complain of headaches at his follow up visit with Dr. Hanson on February 13, 2002, and of "increasing severe headaches" on April 30, 2002. (Tr. 187).

Because of Jessee's headaches, Dr. Hanson referred him to Julia Jones, M.D., a neurologist, for an evaluation. The results of Jessee's neurological evaluation showed:

*Mental Status*: The patient is alert, appropriate, and follows commands without difficulty. Speech is normal.

*Cranial Nerve Exam*: III through XII were normal.

*Reflexes*: 2 in the uppers, 3 patellar. He has sustained colonus at both ankles.

*Sensory Examination*: Intact to light touch & pinprick.

*Cerebellar*: Normal finger-nose and rapid alternating movements.

*Gait Exam*: The patient could heel and toe walk with normal base and station. (Tr. 91, 185).

In her report dated May 2, 2002, Dr. Jones opined that Jessee "has a long history of migraine headaches, some of which may be triggered by cervicogenic pain." (Tr. 185). According to the treatment note, Jessee wanted to "hold off on testing" and instead see how he responded to a trial of anti-depressants such as Effexor or Wellbutrin, as prophylaxis. (Tr. 185-186). On May 8, 2002, Jessee called to request that Dr. Jones refill his prescription for Imitrix. (Tr. 87). Jessee left a phone message on May 13, 2002, about a headache he had over the weekend. According to the message, the blood vessels in his eye broke. Also, Jessee stated that the Imitrex worked and he was not taking the other preventative medication. Dr. Jones wrote: "I would favor keeping a headache diary,

10

discontinuing Excedrin products, and trying the triptains for acute abortive therapy of headaches. We will try him on anti-depressant trial for prophylaxis of his headaches since this could certainly lower both musculoskeletal tension type headaches as well as migraines.  We will give him some samples of Effexor.  Other options would be Wellbutrin." (Tr. 91-92, 185-186).  At his next visit on June 11, 2002, Jessee reported a headache that lasted all week.  Jessee reported that initially the Imitrix would make the headache go away but now the headache would come back.  Dr. Jones wrote: "Imitrix only stops headaches for a while." As to the antidepressants, Jessee reported that Effexor made him nauseous.  Dr. Jones told him to try a different sample.  (Tr. 79).  On June 19, 2002, Jessee returned for a follow up appointment with Dr. Jones.  The progress note reveals that Dr. Jones was going to coordinate his medication with Dr. Hansen.  She prescribed Medrol dose pack and Imitrix and Wellbutrin for headaches.  (Tr. 78).

Dr. Hanson later reported on June 26, 2002, that:

[Jessee] states he is extremely frustrated with his pain.  He states he has been unable to work much since the first of the year and has lost twenty-three days of work.  He is complaining of neck pain, headaches, and difficulty with his speech.  X-rays today reveal definite solid fusion.  He states that Dr. Jones put him on some medication for his headaches, which is definitely helping.  I have advised that we go ahead and try a course of anti-inflammatories.  He will return in two months for follow-up.  (Tr. 182)

During this office visit, Dr. Hanson provided Jessee with a "Work/School Excuse Form" indicating that Jessee cannot "return to work/attend physical education activities until further notice due to complications and pain in spine and neck."  (Tr. 183).

On December 5, 2003, Leonard Hershkowitz, M.D., a neurologist, examined Jessee and reported the following:

On neurological examination, the mental status was intact ... There was no thought

11

disorder.  The examination of cranial nerves II through XII was normal.  Motor system examination revealed normal tone, posture and bulk without weakness or abnormal movements.  His reflexes were +2 in the uppers.  They were extremely brisk to +3 in the lowers.  He has sustained ankle clonus bilaterally.  He also had bilateral Babinski signs, left more than right.  Sensory examination was unrevealing.  Cerebellar testing was normal.  Station and gait showed what I felt was a myelopathic gait.  It was rather stiff , with his spine being hyperlordotic.

His weight today was 194 and his height was 6'.

Based on current evidence, I believe this gentleman can do work activities such as sitting, standing, and moving about.  He can certainly handle items, hear and speak.  I believe, however, because of his three surgeries to his neck, of which the last one has failed, it would not  be in his best interest to be lifting items or carrying them.  In terms of the allegation of pain, I believe it corresponds to my findings.  At the present time there is no unnatural pain behavior.  He does have some tenderness and spasm in the cervical region.  He has significant loss of motion, but remember he has had a fusion.  I have already mentioned the motor, sensory, and reflex changes.  The range of motion of his cervical spine is essentially 20 degrees forward with no extension and approximately 20 to 30 degrees of lateral rotation.

There is no loss of dexterity of coordination of his hands.  There is no loss of disorganization of motor function.  He does ambulate effectively without assistive devices, as mentioned in my description of his gait.

I have filled out the ability to do work-related activities to the best of my ability.

I would take this opportunity to state that I am concerned about this gentleman's reflexes and Babinski signs.  He would seem to have an ongoing myelopathy.  I would strongly recommend this be assessed by his private doctors, if it has not been so.  A spinal cord survey with MRI I think would be very helpful.  If the hardware that he has in his neck gets in the way, he may very well need a myelogram, but he does have evidence of a myelopathy.  (Tr. 148, 150).

In addition to his written assessment, Dr. Hershkowitz completed a form entitled "Medical Assessment To Do Work-Related Activities (Physical)", in which he opined that Jessee could frequently lift and carry less than 10 pounds and occasionally lift and carry 20 pounds based on his diagnosis of three cervical surgeries and chronic pain.  Dr. Hershkowitz further opined that Jessee's standing, walking and sitting was not affected by his clinical findings.  With respect to postural

capabilities, Dr. Hershkowitz opined that because Jessee had three cervical surgeries, loss of ability to move neck and possible myelopathy, Jessee occasionally could stoop, crouch, kneel and crawl and could frequently climb and balance.  Further, Dr. Hershkowitz opined that Jessee had no physical functions that were limited based on his medical diagnosis. Finally, Dr. Hershkowitz opined that because of chronic cervical pain and possible myelopathy, Jessee could not be around heights and vibration but otherwise had no environmental factors.  (Tr. 151-152).

M. Dolan, M.D,, a State Agency reviewing physician opined that Jessee could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours out of an 8 hour workday, and sit 6 hours out of an 8 hour workday." (Tr. 141).  Dr. Dolan identified no limitations in Jessee's ability to push and/or pull, but did recommend against any overhead reaching.  (Tr. 141).

In this case, the ALJ sought the assistance of Woodrow Janese, M.D., to evaluate the medical evidence available.  Dr. Janese opined that Jessee did not meet or equal listing 1.04, A, B, or C, and diagnosed "status post cervical spine fusion, C-4 through T-1, and headaches, etiology unclear." (Tr. 231).  With respect to Jessee having a bilateral positive Babinski sign at his December 2003, evaluation by Dr. Hershkowitz, Dr. Janese testified as follows:

Q.  Somewhere in the record, I don't — I didn't write down where it was, but did he have a bilateral positive Babinski signs?

A.  Yes.  He had–

Q.  What's the significance of that?

A.  Well, in December he stated that he had extensor or dorsi flexion of stimulation of his soles, and this is Babinski.  And this indicates a long track abnormality.  And you would think about some type of cervical myelopathy.  But his MRI did not show that he had cervical spondylosis – excuse me, cervical stenosis.  But yes, that's a significant finding.  But he's had – on several other occasions, in May of 2002 he had [inaudible] normal motor exam.  You would expect if he had Babinski's to have

13

symptoms of abnormal gait, and his gait was normal on the examination.

Q.  Did you have any explanation or can you think of any?

A.  Yeah, I think probably it's not correct.

Q.  What, the Babinski?

A.  Yeah.

***

Q (Atty).  That report also notes a myelopathic type of gait.

ME:  Well, let me just — I'm not sure exactly what a myelopathic type of gait is, but I'll look at that, because I – let me see here.  "His motor system examination revealed normal tone posture, and bulk, without weakness or abnormal movements.  His reflexes were two plus, in the uppers."  If he had cervical myelopathy, you would expect that he would have increased reflexes in the uppers.  "They were extremely brisk [phonetic] – extremely brisked, three plus, in the lowers."  Now, three plus is not extremely brisk.  That's just hyperactive.  Extremely brisk might be four, which is unstained clonus or five, which is sustained clonus.  "He had sustained ankle clonus bilaterally.  He had bilaterally Babinski's, left more than right.  Babinski is a Babinski; they generally don't grade Babinskis.  If the big toe goes up, and the toes spread, it's a Babinski.  "Sensory examination was unrevealing."  You would expect if he had some compression of his cord, he would have some post – excuse me, post rear column change."  [inaudible] testing if normal.  Station and gait showed what I felt was a myelopathic gait."  Myelopathic gait would be considered ataxic gait.  Okay, this was 12/03.  And this was the latest exam.

***

Q.  Do you think we should have another neurological exam to resolve this conflict, maybe of whether or the reflexes are Babinski or —

A.  More information is always valuable.  I would not —

Q.  If it's reproducible or not?

A.  Well, I wouldn't – some people can have false positive Babinski signs or sometimes it – see, when you touch a baby's foot, they get a Babinski, because they are [inaudible] is not fully formed or myelinated.  Some times if you scratch the bottom of their feet, you'll get a withdrawal, with an extension of the toe.  *But all*

*neurologists are supposed to differentiate that. They're not supposed to give false positives. So, I would say that that exam is – he has increased reflexes, as [inaudible]. But if you — I'm not supposed to suggest get another exam. But I –*

Q. Oh, you're not?  Oh, I didn't know that.

A.. Well, no, I was told I wasn't.

Q. Oh, well, I didn't tell you that.

A. No. No. You didn't.  No, no, you didn't tell me that.  But if — I would feel comfortable with my evaluation, based on my information. *But the more information you have, the better.*  (Tr. 231-235) (emphasis added).

In addition, Dr. Janese testified concerning Jessee's allegations of pain.  According to Dr. Janese, "if you don't have movement, you don't have pain.  So, if [Jessee] does not have any movement, then the surgery had been successful and he should be okay."  (Tr. 253-254).  Dr. Janese testified that the surgery was performed on Jessee because "it's the pain from the movement of your neck that causes the headache from cervical spondylosis.  So if you fuse it, it won't move.  So, it shouldn't cause any pain" (Tr. 260) or "[y]ou have pain from cervical spondylosis with movement of you[r] neck"...[t]he doctors fuse it so you don't have movement."  (Tr. 261).  Dr. Janese stated, however, Jessee has some movement of the neck, albeit, "not a lot."  (Tr. 262).  With respect to Jessee's ability to move his neck, Dr. Janese opined:  "I think he'd be able to move his chin down, because if he was totally incapacitated, the doctor's wouldn't operate on him.  I mean, they wouldn't operate to give him a severe disability.  They operated to help him.  And he should be able to move his head and his eyes so that he can look down.  Even with that fusion."  (Tr. 255).  However, Dr. Janese testified that based on Jessee's treating physician's measurements of his range of motion, that Jessee had a significant limitation.  (Tr. 258).  Dr. Janese testified that Jessee's headaches could be caused by sinus infections and a history of cataract.  (Tr. 259).

15

Also, Jessee testified at the hearing.  According to Jessee, he was let go from his job of five years because of excessive absenteeism. (Tr. 238).  According to Jessee, he has problems with his left arm and right index finger.  (Tr. 238).  Jessee testified that his left arm goes numb and he experiences "little burn spots and pain spots."  (Tr. 240).  He described  the pain in the arm as "attacks" or "a line that you can feel.  It goes numb" or as stabbing pains that go down the back of his neck, all the way down the shoulder and through the arms.  (Tr. 240).  According to Jessee, because of the left arm pain, he keeps the left arm laying in his lap.  Jessee testified that he has continued to have neck problems following the third surgery.  (Tr. 236).  For example, following the third surgery, Jessee has had more problems holding his head up, with his arm, and with headaches, which he described as "working up the back of my head."  (Tr. 238).  With respect to Jessee's testimony about his difficulty holding his neck up, the following exchange took place between Jessee and the ALJ:

Q.  Okay.  Now, let's start— you said you can't hold your head up.  But I've noticed since we've been in the hearing, you've had one or both arms---hands, I mean—

A.  I use — yeah, I'm just supporting, take — trying to take some of the weight of my head off my neck.  It just kind of like as a turtle closes its head up in shell.  I'm just supporting my neck, and I also rub the back of my neck because it hurts all the time.  It's stiff, it's sore, and it hurts.  But I'm just holding up the weight of my head.

Q.  Okay. Do you do that in any other way, other than with your hands?

A.  Sometimes I wear my soft collar that I have.  I wear that sometimes around the house.  I wear it whenever I'm in an automobile.

Q.  Okay.  Why didn't you wear it today?

A.  I've got it in my pocket.  And I have [inaudible].  And of course, I wore one coming up here in the vehicle.

Q.  All right.  All right, now you – at home, what do you use to support your head?

16

A. I'm always either in a reclined position, all the way across the shoulders, my neck and my head or I'm either laying down flat in bed.

***

Q. All right.  Now, you've been shifting around as well [inaudible] in the chair.  Can you tell us, do you have problems sitting in a straight-back chair?

A. Yes, I can't sit very long.  I'm having a hard time right now.  (Tr. 239, 247).

Jessee estimated he could sit in a chair around 15 minutes before he would need to stand up and stretch around.  (Tr. 247).  In addition, Jessee testified he could probably stand 10 to 15 minutes. (Tr. 248).  Jessee testified he could lift very little, especially with his left arm.  He estimated that he could lift or pick up nothing heavier than a gallon of milk.  (Tr. 248).  Further, Jessee testified that bending aggravates his neck.  (Tr. 248).  Jessee testified that when he is a great deal of pain, he loses temper and prefers to be alone.  (Tr. 249).  Jessee testified he has had more trouble walking.  (Tr. 250).  In addition, Jessee addressed the gap of time between doctor's visits.  According to Jessee, he had medical insurance up until June 2002 but when he lost his job, he lost his health benefits.  (Tr. 250).  Thereafter, Jessee testified all his health care has been though the Harris County Hospital District.  (Tr. 251).  According to Jessee, he waited from October 2002 to June 2003 for an appointment.  (Tr. 251).

Also, Jessee testified about his headaches.  According to Jessee, he gets headaches three to four times a week.  (Tr. 242).  Jessee estimated that the headaches last between six and twelve hours.  (Tr. 243).  Jessee testified that he spends most of his day in bed or in a recliner.  (Tr. 243). Jessee testified that he eats dinner, alone in his room, in a reclined position, with the plate on a pillow so that it is level with his chest.  (Tr. 246).  Also, Jessee testified that following his last surgery, he has problems breathing because of the plate in his neck, and his voice has become hoarse.

17

(Tr. 246).

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez,* 64 F.3d at 176). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 176 (5th Cir. 1995) (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

18

(1)      the physician's length of treatment of the claimant,

(2)      the physician's frequency of examination,

(3)      the nature and extent of the treatment relationship,

(4)      the support of the physician's opinion afforded by the medical evidence of
         record

(5)      the consistency of the opinion with the record as a whole, and

(6)      the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ..., providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

19

§ 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Jessee challenges the extent to which the testimony of the medical expert, Dr. Janese, in lieu of his treating physician(s) and examining physician, was relied upon by the ALJ to resolve ambiguities in the record.  Jessee contends that the ALJ should have recontacted his treating physician(s) or examining physician or sent him for a further evaluation because there was not enough information in the record for the ALJ to make an *informed* decision.  Even through the ALJ does not have the burden of proof at the first four stages, the ALJ does have a duty to fully and fairly develop the facts relevant to a claim for benefits.  *See Brock v.* Chater, 84 F.3d 726 (5th Cir. 1996); *James v. Bowen*, 793 F.2d 702, 204 (5th Cir. 1986); *Kane v. Heckler*, 731 F.2d 1216, 1219-1220 (5th Cir. 1984).  The failure by the ALJ to comply with this duty to develop the record constitutes error and results in a decision that is not supported by substantial evidence.  When existing medical evidence is inadequate to make a disability determination, the Social Security Regulations impose a duty on the ALJ to develop the record by recontacting a claimant's medical sources or referring the claimant for a consultative medical examination.[3]  In addition, Social Security Ruling 96-2p

---

[3] 20 C.F.R. § 404.1512 provides:
(e) Recontacting medical sources.  When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions:
(1) We will first recontact your treating physician or psychologist or other medical

states that additional evidence or clarifying reports may be necessary when the treating source's medical opinion appears lacking or inconsistent.  Similarly, Social Security Ruling 96-5p requires the ALJ to make a reasonable effort to recontact a treating source who offers an ultimate issue opinion for clarification of the treating source's reasons when the ALJ cannot ascertain the basis of the opinion from the case record.  As such, where the existing medical evidence is inadequate to make an *informed* disability determination, the Commissioner has a duty to develop the record by recontacting a claimant's medical sources or by referring the claimant for a consulting exam.

Here, it is undisputed that the most current medical evaluation was performed by Dr. Hershkowitz, a neurologist in December 2003.  In that report, Dr. Hershkowitz described Jessee's third and most recent surgery as one from which "he never made any type of recovery."  (Tr. 148). In connection with this evaluation, Dr. Hershowitz measured Jessee's neurological status.  With respect to these findings, Dr. Hershkowitz recorded that Jessee's "reflexes were +2 in the uppers. They were extremely brisk to +3 in the lowers.  He has sustained ankle clonus bilaterally.  He also had bilateral Babinski signs, left more than right."  (Tr. 148, 150).  Based on these clinically significant findings, Dr. Hershkowitz wrote:  "I would take this opportunity to state that I am concerned about this gentleman's reflexes and Babinski signs.  He would seem to have an ongoing

---

source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques... (f) Need for consultative examination.  If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense.  20 C.F.R. § 1512(e)-(f).

myelopathy.  I would strongly recommend this be assessed by his private doctors, if it has not been so." (Tr. 150).   In contrast, at the administrative hearing, the non-examining, testifying expert, Dr. Janese, attempted to discount Dr. Hershkowitz's findings.  Dr. Janese recognized, nonetheless, that neurologists like Dr. Hershkowitz are trained to "differentiate" such responses as Babinski signs and he further stated while he had been told that in his capacity as a testifying medical expert could not recommend another exam, he opined that the better practice would be to have more information in order to make a more informed decision.  Based on the suggestion by Dr. Hershkowitz, neurologist, that Jessee, in his medical opinion, had myelopathy, and because the medical records are replete with references to Jessee's complaints of arm pain, neck pain and headaches, and because Jessee had bilateral Babinski signs, left more than right, the ALJ erred by not recontacting Dr. Hershkotitz concerning his examination of Jessee or, in the alternative, by sending Jessee for a consultative neurological evaluation.

Likewise, Dr. Hershkowitz measured Jessee's range of motion.  Again, this is most recent measurement of Jessee's range of motion following the third surgery, and therefore the most probative of Jessee's functional abilities.  According to Dr. Hershkowitz's measurements, Jessee had a "range of motion of his cervical spine is essentially 20 degrees forward with no extension and approximately 20 to 30 degrees of lateral rotation." At the administrative hearing, Dr. Janese testified about the interplay between a fusion and Jessee's complaints of headache pain.  According to Dr. Janese, with a successful fusion, there should be no movement, and therefore no pain.  This testimony by Dr. Janese that Jessee should have no pain, conflicts with Dr. Hershkowitz's finding that Jessee had a range of motion of his cervical spine, which could cause cervicogenic headache pain. Because Jessee has alleged disability based in part on headache pain, and given Dr. Janese's

22

opinions concerning the interplay between headache pain and a successful fusion, the ALJ erred by

not recontacting Dr. Hershkowitz to clarify the measurementsof Jessee's range of motion, or in the

alternative, by not referring Jessee for a consultative examination.

Jessee further contends that the ALJ erred in rejecting the opinion of his treating physcian,

Dr. Hanson.  The ALJ wrote:

> Under the "treating physician rule" the opinion of a treating physician is controlling
> only if it is "well supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the other substantial evidence in
> the case record."  (20 CFR §§ 404.1527(d)(2) and 416.927(d)(2)).  If the treating
> physician's opinion is not given controlling weight, the weight to be given the
> opinion is determined by applying the following factors:  (1) the length of the
> treatment relationship and the frequency of the examination; (2) the nature and extent
> of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the
> consistency of the opinion with the record as a whole; (5) whether the opinion is of
> a specialist; and (6) and other factors which tend to support or contradict the opinion.
>
> The Administrative Law Judge has considered the statement of Dr. Gregory Hanson,
> M.D., who [h]as treated the claimant on several occasions.  In a work/school excuse
> form dated June 26, 2002, Dr. Hanson indicated that the claimant was unable to
> return to work until further notice due to complications with pain in the spine and
> neck (Exhibit 9F, page 2).  However, the medical record fails to support the
> statement of Dr. Hanson. Progress notes from Dr. Hanson dated February 13, 2002,
> document radiological findings revealing good progression of the fusion. Also, when
> seen on April 30, 2002, the claimant reported arm symptoms; however, it was
> annotated that they were not severe.  Additionally, x-ray findings at that time,
> revealed a solid fusion. (Exhibit 9F, page 6).  Dr. Hanson's statement is rejected.
> Insofar as Dr. Hanson states that the claimant is "unable to work," his opinion
> concerns an issue reserved to the Commissioner.  The Commissioner has the final
> statutory responsibility to make determinations such as this (Social Security Ruling
> 96-5p).  The evidentiary weight to be given to such an opinion depends upon whether
> it is supported by specific and complete clinical findings or other objective medical
> evidence and whether it is consistent with the other evidence.  This opinion is not
> persuasive because it is a blanket statement without any effort to quantify or explain
> the specifics of the opinion.  (Tr. 13-14).

Jessee contends the ALJ erred in discounting in their entirety  Dr. Hanson's treating opinions, since

his opinions as Jessee's treating physician under *Newton* are entitled to some weight, and by not

evaluating the totality of Dr. Hanson's records in light of the factors outlined in *Newton*.  Here, the record reflects that Jessee's argument is well-taken. Dr. Hanson had the longest treating relationship with Jessee.  Moreover, considering that Dr. Hanson's records show that Jessee's condition changed overtime, the ALJ erred by relying on the earlier treatment records and ignoring the more recent records.   For instance, it is undisputed that in January 2002 Jessee showed a "good fusion." However, the records further show that by February 2002, Jessee complained of increasing headaches, which were so severe, that Dr. Hanson, in response, referred him to a neurologist, Dr. Jones.  Also, the record shows that Jessee missed twenty days of work between February 13, 2002 and June 21, 2002.  (Tr. 275).  During the summer of 2002, Dr. Jones and Dr. Hanson coordinated their treatment of Jessee.  The ALJ erred by looking at the excuse from work/school excuse in isolation.  Moreover, none of  Jessee's treating physicians (Dr. Hanson or Dr. Jones), or examining but not treating physician, (Dr. Hershkowitz) suggested that Jessee's pain was exaggerated.  In addition, Dr. Hanson's notations concerning Jessee's headaches do not suggest that the headaches were *gone.*  Rather, Dr. Hanson's records are consistent with the records of Dr. Jones.  Further, to the extent the ALJ found it significant that the medical records were silent about headache pain until his evaluation by Dr. Hershkowitz in December 2003, the record shows that because Jessee had no health insurance, he could not seek treatment.  Upon this record, the ALJ failed to properly develop the record, and on remand should assess the medical opinions in accordance with the proper legal standards.

## C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a

claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Seders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  Because the ALJ made and supported his credibility determination based upon his residual functional capacity assessment, which should be reconsidered on remand because that assessment is inextricably intertwined with the expert opinion factor, this factor neither weighs in favor of or against the ALJ's determination.

### D.  Education, Work History, and Age

Lastly, the final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous

work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Jessee, at the time of the hearing,  was fifty-two years old, and had completed high school. Jessee's past work was as an inside salesperson. The ALJ questioned Emma Vasquez, a vocational expert ("VE"), at the hearing about Jessee's ability to do his past work and his ability to engage in other gainful work activities.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling v. Halala*, 36 F.3d 431, 436 (5th Cir. 1994).

Given that the matter should be remanded for further record development, which may affect the ALJ's assessment of Jessee's residual functional capacity, which was incorporated in the hypothetical questions posed to the Vocational Expert, on remand, the ALJ should reconsider Jessee's ability to perform his past relevant work, or any work.

**V. Conclusion**

Based on the foregoing, and the conclusion that a further development of the record is necessary because substantial evidence does not support the ALJ's finding that Jessee could perform a full range of sedentary work, and because the ALJ failed to apply the proper standards in evaluating medical opinions, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (Document No. 13), is DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 15) is GRANTED, and that this case is REMANDED to the Social Security Administration pursuant to 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 3rd  day of  March, 2006.


Frances H. Stacy
United States Magistrate Judge